UNITED STATES BANKRUPTCY COURT                    FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
In re                                          :        Chapter 11
                                               :
GREENWICH RETAIL GROUP LLC,                    :        Case No. 25-11295 (MEW)
                                               :        Jointly Administered)
        Debtors.                               :
---------------------------------------------------------x
GREENWICH RETAIL GROUP LLC,                    :
                                               :
        Plaintiffs,                            :
                                               :
        -against-                              :        Adv. Proc. No. 25-01106 (MEW)
                                               :
MOBY CAPITAL, LLC, *et al.,*                   :
                                               :
        Defendants                             :
---------------------------------------------------------x

<u>DECISION ON PENDING MOTIONS TO DISMISS</u>

A P P E A R A N C E S:

KASOWITZ LLP
New York, NY
*Attorneys for Defendant Itria Ventures LLC*
   By:  David J. Abrams, Esq.
        Matthew B. Stein, Esq.
        Hunter S. Pearl, Esq.

GIULIANO LAW, PC
Melville, NY
*Attorneys for Defendants Smart Business, Square Advance and Newco Capital
Group VI LLC*
   By:  Anthony F. Giuliano, Esq.

DAVIDOFF HUTCHER & CITRON LLP
New York, NY
*Attorneys for Plaintiff Greenwich Retail Group LLC*
   By:  James B. Glucksman, Esq.

1

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding brought by Debtors Greenwich Retail Group LLC ("**GRG**") and Madison Westside LLC ("**Madison**") challenges the Debtors' obligations under agreements that the Debtors have characterized as "merchant cash advance" transactions.  The Debtors have settled with some defendants, and some other defendants have filed answers.  Four defendants have filed motions to dismiss.  Defendant Itria Ventures LLC ("**Itria**") seeks the dismissal of all claims against it.  Defendants Newco Capital Group VI LLC ("**Newco**"), Smart Business and Square Advance seek dismissal of some (but not all) of the asserted claims.  The moving defendants are identified hereafter as the "Defendants."

The Court heard argument on December 10, 2025.  With the Court's permission, Itria filed a supplemental memorandum on January 15, 2026, to address an issue that had been discussed during oral argument, and the Debtors filed a response on February 2, 2026.

For the reasons set forth below, the motions to dismiss are granted in part, with leave to replead some of the dismissed claims, and are otherwise denied.

### The Amended Complaint and the Debtors' Later Concessions

The Amended Complaint asserts twenty-eight causes of action, though the numbering is confusing because two counts were each accidentally designated as Count V.  Twenty-two of the stated causes of action have been asserted against one or more of the Defendants.  The relevant counts in the Amended Complaint are:

- Count I, which seeks a declaration that "all liabilities" owed to the Defendants are void under New York's usury laws and that the amounts claimed by the Defendants should be negated;

2

- Count III, which contends that a confession of judgment in favor of Itria, as well as a New York state court judgment entered pursuant to that confession of judgment, are void based on fraud in the inducement, reservation of usurious interest, lack of consideration, and fraudulent transfer;

- Count IV, which asserts that the Debtors paid not less than $325,000 to Itria from and after July 29, 2024, and that such payments should be avoided and recovered based on alleged fraud in the inducement, reservation of usurious interest, lack of consideration, and fraudulent transfer;

- Count V (Newco), which asserts that the Debtors paid $152,861 to Newco from and after September 26, 2024, and that such payments should be avoided and recovered based on alleged fraud in the inducement, reservation of usurious interest, lack of consideration, and fraudulent transfer;

- Count V (Square Advance), which asserts that the Debtors paid $99,509 to Square Advance from and after September 26, 2024, and that such payments should be avoided and recovered based on alleged fraud in the inducement, reservation of usurious interest, lack of consideration, and fraudulent transfer;

- Count VI, which asserts that the Debtors paid $54,252 to Smart Business from and after December 6, 2024, and that such payments should be avoided and recovered based on alleged fraud in the inducement, reservation of usurious interest, lack of consideration, and fraudulent transfer;

- Count VIII, which contends that the Defendants are in possession of fraudulent transfers that they have not returned and that their claims should be disallowed under Section 502(d) of the Bankruptcy Code;

3

- Count IX, which seeks a declaratory judgment that the parties' contracts are governed by New York law;

- Count X, which seeks a declaration that the parties' contracts are unconscionable and are contracts of adhesion under New York law and should be declared void;

- Counts XI and XII, each of which seeks a declaration that the transactions with the Defendants are loan transactions;

- Counts XIII and XIV, which contend that the contracts with the Defendants are void due to impossibility and unconscionability and which also seek orders declaring the secured or unsecured status of the Defendants' claims and, if the Defendants' claims are secured claims, the relative priorities of the Defendants' secured claims in relation to the claims of other secured creditors;

- Count XV, which seeks an order equitably subordinating the claims of the Defendants to the claims of all other creditors;

- Count XVIII, which seeks an order disallowing the Defendants' claims pursuant to Section 502(b)(2) of the Bankruptcy Code on the ground, and to the extent, that the Defendants seek to recover "unmatured interest;"

- Count XIX, which contends that the Defendants are in possession of fraudulent transfers that they have not returned and that their claims should be disallowed under Section 502(d) of the Bankruptcy Code;

- Count XX, which seeks a declaration that the obligations owed to the Defendants are unenforceable under New York civil and criminal usury statutes;

- Counts XXI and XXII, each of which seeks an order extending the automatic stay to include Guarantors of the Debtors' obligations under the contracts with the Defendants;

- Count XXIII, which asserts that if the Court determines that the underlying transactions are purchases of receivables, and not loans, that the Court should then approve the rejection of the contracts pursuant to Section 365(a) of the Bankruptcy Code;

- Count XXVII, which alleges that the contracts with the Defendants are void due to fraud in the inducement and on fraudulent transfer grounds; and

- Count XXVII, which contends that the Defendants have acted inequitably and that their claims should be equitably subordinated.

There is significant overlap or outright duplication in the asserted claims. Some of the counts also lump several theories together, contending (for example) that certain results should be reached on the grounds of fraud in the inducement, reservation of usurious interest, unconscionability and fraudulent transfer.

Itria has sought dismissal of all claims against it, but some claims that the Debtors have asserted either are not disputed or are otherwise not ripe for resolution:

- The Debtors have asked the Court to declare that the parties' contracts are governed by New York law. Each of the contracts with the Defendants states that it is governed by New York law and no Defendant has contended otherwise, at least at this stage of the proceedings. The Debtors have not asked for rulings on the issue and the Defendants have identified no reason to dismiss this claim.

- The Debtors have asked that I determine whether the claims of the Defendants are secured or unsecured and, if they are secured, what priority those claims have in relation to the claims of other secured creditors. Those determinations will depend at

5

least in part on the nature and extent of other secured creditors' claims, the collateral

that supports those other claims, the collateral that allegedly supports the Defendants'

claims, the relative priorities of the creditors' competing interests in collateral, and the

overall value of the relevant collateral.  These are proper requests for relief, and they

are not subject to resolution on a motion to dismiss.

- The Debtors have asked that I extend the automatic stay to cover individual guarantors
  and that I approve a rejection of the parties' contracts in the event they are found to be
  executory purchase contracts.  The Debtors have not sought any present ruling as to
  those requests for relief, and no good reason has been offered as to why those asserted
  causes of action should be dismissed.

Debtors' counsel also has conceded, in written responses and during the hearing on

December 10, 2025, that some of the asserted claims should be dismissed in whole or in part:

- Debtors' counsel acknowledged that if the entire underlying transactions with the
  Defendants were found to be fraudulent transfers and were avoided, the Defendants
  would then have a claim to recover the value of the consideration that they paid to the
  Debtors.

- Counsel acknowledged that the Debtors are limited liability companies and that under
  New York law they are not entitled to assert claims or defenses under New York's civil
  usury statute.  *See* New York Limited Liability Company Law § 1104(a); *Am. E. Grp.,
  LLC v. LiveWire Ergogenics, Inc.*, 2020 WL 469312, at * 7 (S.D.N.Y. Jan. 28, 2020).

- The Debtors acknowledged that under New York's criminal usury statute they would
  only have rights to challenge the Defendants' claims to recover the amounts that remain
  unpaid, and that the Debtors would not have affirmative rights (under the criminal

usury statute standing alone) to recover amounts previously paid.  *See Intima-eighteen,*

*Inc. v. A.H. Schreiber Co.*, 172 A.D.2d 456, 457-8  (1st Dep't. 1991).[1]

- Debtors' counsel stated that many of the claims asserted in the Amended Complaint
  (that the contracts were unconscionable, that they were contracts of adhesion, that they
  were the products of fraudulent inducement, and that performance is impossible) are
  not being pursued as independent grounds for relief and that the allegations made in
  support of those particular claims are relevant only as grounds for the equitable
  subordination claims that have been asserted.

The remaining claims before the Court that are properly subject to one or more of the

motions to dismiss are: (1) claims that the entire agreements with the Defendants, and/or the prior

transfers to the Defendants, and/or the Confession of Judgment issued in favor of Itria, and/or the

later judgment entered in favor of Itria, should be voided on fraudulent transfer grounds;

(2) contentions that the Defendants' claims should be disallowed under Section 502(d) of the

Bankruptcy Code; (3) contentions that the transactions should be treated as loans (not sales of

receivables) that violated the New York criminal usury statute, and issues as to the extent of the

relief that the Debtors may obtain on this ground; (4) claims that some portions of the Defendants'

claims should be disallowed because they represent claims to recover unmatured interest under

Section 502(b)(2) of the Bankruptcy Code; and (5) contentions that Defendants' claims should be

equitably subordinated.  Itria has argued that the Debtors waived some or all of the asserted claims

---

[1]    This concession was limited to the relief that the Debtors could seek based on usury arguments
standing alone.  The Debtors have separately argued that they had the right to assert usury
defenses when prior payment obligations came due, and that the failures to assert those
defenses were waivers of valuable rights that inured to the benefit of the Defendants and that
should be avoided on fraudulent transfer grounds.  Those separate fraudulent transfer
contentions are discussed in Part I(C) of this Decision.

or are otherwise foreclosed from pursuing them; those defenses are discussed below in the context of the claims to which they relate.

**<u>Pleading Standards</u>**

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, which incorporates Federal Rule of Civil Procedure 12(b)(6), permits a bankruptcy court to dismiss claims in an adversary proceeding if the complaint fails to state a claim upon which relief may be granted.  In reviewing a motion to dismiss a court must accept the factual allegations of a complaint as true and must draw all reasonable inferences in the claimant's favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).  The factual allegations must consist of more than mere conclusory statements, however.  *Twombly*, 550 U.S. at 555.  The allegations must be sufficient "to raise a right to relief above the speculative level" and provide more than a "formulaic recitation of the elements of a cause of action."  *Id.* (citations omitted).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a pleading is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "show[n] . . . that the pleader is entitled to relief." *Id.* at 679; *see also id.* at 682 (allegations

8

in a complaint are insufficient if there is an "obvious alternative explanation" for the conduct alleged that is more "likely") (internal quotation marks and citation omitted).

If a pleading refers to agreements and other documents, it is proper for the court to consider the documents as part of the pleading in ruling on a motion to dismiss. *Grant v. Cnty. of Erie*, 542 Fed. Appx. 21, 23 (2d Cir. 2013) ("In its review [of a Rule 12(b)(6) motion to dismiss], the court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence."); *see also Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d. Cir. 2000) (noting that it is proper to consider documents that are quoted in or attached to the complaint or incorporated in it by reference, or that plaintiffs either possessed or knew about and upon which they relied in bringing suit); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (noting that it is proper to consider a document upon which allegations are based, whether or not it is attached to the complaint). Where the allegations of a complaint are contradicted by the plain terms of the incorporated documents, the terms of the documents control. *Id.*; *see also Alexander v. Bd. of Educ. of City of New York*, 648 Fed. Appx. 118 (2d Cir. 2016) (summary order) (dismissing complaint where documents contradicted allegations).

Rule 7009 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 9(b) of the Federal Rules of Civil Procedure, imposes the additional requirement that allegations of fraud must be stated "with particularity." Fed. R. Bankr. P. 7009; *see also* Fed. R. Civ. P. 9(b). If a pleading alleges that fraudulent misrepresentations were made, for example, then the complaint must specify the statements that the plaintiff contends were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent.

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Although "the fraud alleged must be stated with particularity," the requisite intent of the defendant "need not be alleged with great specificity."  *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (citations omitted).  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b), made applicable by Fed. R. Bankr. P. 7009.  Nevertheless, to state a "plausible" claim of fraud a plaintiff "must allege facts that give rise to a strong inference of fraudulent intent."  *Lerner*, 459 F.3d at 290 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

## The Transactions

The Defendants' contracts with the Debtors are similar but not identical.  Only Itria has sought dismissal of claims alleging that the transactions were disguised loans and not true sales of receivables.  It is therefore proper to summarize the Itria agreement in some detail, though the agreements with the other Defendants can be described more generally.

## A.   The Itria "Receivables Sale Agreement."

Exhibit 3 to the Complaint is a "Receivables Sale Agreement" among Itria, GRG and Madison dated July 29, 2024.  The agreement stated that Itria would purchase $640,000 of Receivables from the two Debtors (representing 9.1% of projected Receivables) at a price of $500,000.  An attached "Offer Summary" estimated that the amounts owed to Itria would be paid within 308 days and that the amounts that Itria would earn were equivalent to an "estimated annual percentage rate" return of 65.25%.

The agreement did not identify any specific Receivables that were to be purchased.  Instead, it purported to transfer, to Itria, a share of all future receipts with respect to Receivables until the $640,000 payment amount was reached.  Section 2(c) of the agreement defined "Receivables"

broadly to include all amounts received from customers for the purchase of products and/or services as well as all "accounts, future accounts, contract rights, choses in action and any other rights to payment" and all "insurance proceeds."  ECF No. 3, Ex. 3, § 2(c).  Section 2(c) purported to include "the Receivables of Merchant's subsidiaries and affiliated companies" and of entities that might be created in the future, though at this stage of the proceedings the parties have not been called upon to explain how (if at all) a sale of other companies' Receivables could have been accomplished in a contract to which only GRG and Madison were parties.

The parties agreed at page 1 of the agreement that the transaction represented a purchase of Receivables and not a loan, and the agreement stated that Itria was taking the risk that Receivables might not be available for remittance to it.  The agreement also included waivers of any contention that the agreement was not a true sale of receivables.  *Id.*, §§ 1, 14(a).

The Itria agreement called for weekly payments to be made to Itria in the amount of $14,545.45, plus other direct payments to be remitted by certain credit card processors.  Those payments to Itria were to be the exclusive methods of remittance unless and until a Material Breach occurred.  GRG and Madison were parties to the Itria agreement, but their payment obligations were not stated separately.  Instead, the payment obligations of the two companies appeared to be joint and several.  The fixed payments were meant to represent an estimate of what 9.1% of the weekly Receivables collections would be, but the Debtors allege that this was not a good faith or reasonable estimate.  Amended Complaint ¶¶ 36, 42(g).

Sections 1 and 5 of the Itria agreement gave GRG and Madison the right to seek a "reconciliation" as to prior payments that they had made and with respect to the ongoing weekly amounts that were to be paid.  In the case of prior payments, the period covered by a reconciliation request could not exceed one calendar quarter.  Itria had the right to request documentation, but it

agreed that it would promptly calculate any excess in prior payments during the relevant period and that it would provide a "credit or refund" if such an excess were found. The agreement also stated that if there were a request for an adjustment of the weekly payment amount then documentation would be required on an ongoing basis. However, the agreement did not specify how any adjustment to the ongoing payments would be calculated.

Notably, the agreement did not purport to grant separate reconciliation rights to the two separate Debtors. The reconciliation provisions appeared to operate on a collective basis, so that a significant reduction in one Debtor's receipts would not have warranted relief so long as the other Debtor's collections were sufficient to make up the difference. The agreement also stated that Itria had the right to decline a reconciliation request if a Material Breach was then in effect.

The agreement included representations, warranties and covenants by the Debtors, any breach of which was a "Material Breach." ECF No. 3, Ex. 3, § 7(A)(i). One such covenant, representation and warranty was that the Debtors had not entered into any merchant cash advance or loan agreement or other indebtedness that pledged or encumbered any of the Receivables, and that the Debtors would not do so during the term of the Itria contract. *Id.* §§ 2, 6(B)(vii). The Amended Complaint alleges, however, that at the time of the Itria transaction the Debtors were parties to prior secured loans that were backed by security interests in the Debtors' receivables, and that the Debtors also were parties to other merchant cash advance transactions that were still outstanding. At the hearing, Itria's counsel acknowledged that other parties' purported interests in the Debtors' receivables would have been disclosed in UCC filings and that Itria likely was aware of those other transactions. This raises the prospect that, with Itria's knowledge, the Debtors were in Material Breach of the Itria agreement from the moment it was executed.

Section 10 of the Itria agreement provided Itria with an ongoing right to obtain credit reports and other credit information about the Debtors. The Debtors also represented and covenanted in the Itria agreement that the bank statements and financial statements and other documents they had provided fairly represented their financial condition and results of operation (*id.* § 6(C)(i)), that all information provided about the Debtors' business was truthful, accurate and complete (*id.* § 6(C)(ii)), that the Debtors did not contemplate a bankruptcy filing (*id.* § 6(A)(vii)), that the Debtors would promptly notify Itria of any "material judgment" against the Debtors or their assets (*id.* § 6(A)(ix)), and that the Debtors would "immediately" notify Itria as to any material change in the condition of the Debtors or their business. *Id.* § 2. The Debtors agreed to conduct their business "in good faith and consistent with past practice" and not to take "any action designed to impair or frustrate Purchaser's ability to collect Receivables." *Id.* § 6(B)(i). The Debtors also agreed not to permit any event to occur that would cause a diversion of Receivables to any unauthorized account, *id.* § 6(B)(iii), that they had no intent to close their businesses, *id.* § 6(B)(vi), and that the would "continue to operate the Merchant business in good faith." *Id.*, § 1.

Other circumstances that constituted a "Material Breach" of the Itria agreement included any interference with Itria's rights to collect the amounts due to it, or the imposition of any material judgment or garnishment that was not disclosed to Itria. *Id.* § 7(A)(ii) and (iii)). Any failure to pay the amounts due to Itria also was listed as a Material Breach. *Id.* § 6(B)(ii). However, the agreement states that if the "aggregate" amounts paid to Itria ultimately were less than the "Stated Amount Sold," despite the Debtors' best efforts to operate their businesses in compliance with the agreement, and so long as no other breach of the agreement had occurred, then such diminution in payments "shall not in itself be deemed a Material Breach." *Id.* § 7(B)(i). The Agreement also

stated that a bankruptcy filing or the Debtors' insolvency "is not in itself" a Material Breach.  *Id.*, § 7(B)(ii).

If a Material Breach occurs, then the agreement provides that Itria is entitled to recover the full amount owed to it, plus collection costs, including attorneys' fees and a fixed amount of $2,500 to cover "in-house" collection costs.  Section 9 of the agreement included a grant of security interests to secure Itria's collection rights.  Those security interests applied not only to Receivables, but also to all equipment and inventory and other assets of the Debtors.  Itria also obtained a "Performance Guaranty" from the Debtors' individual owners that was triggered whenever any Material Breach occurred and that entitled Itria to seek full payment from the guarantors.  The Debtors and the guarantors also executed confessions of judgment that could be filed in the event of any Material Breach.

The Debtors repaid $319,999.90 of the sums owed to Itria under the agreement, which is less than the amount of collections that Itria purported to purchase ($640,000) and also less than the amount that Itria actually paid to the Debtors ($500,000 minus a fee of $10,500, for a net payment of $489,500).  At some point the Debtors stopped making payments to Itria, though it is unclear to the Court when that happened.  Itria filed the confession of judgment in the Supreme Court, New York County on January 15, 2025, and judgment was entered against the Debtors and the individual guarantors on April 23, 2025.  The judgment included an award of prejudgment interest from and after January 9, 2025 at the rate of sixteen percent (16%).

On October 3, 2025 (after the filing of the Amended Complaint) Itria filed a proof of claim (Claim No. 29-1) in the amount of $334,813.60, representing the judgment amount plus interest, costs, and continuing post-judgment interest.  Itria contends that the claim is a secured claim and that all property of the Debtors located in the County of New York serves as collateral for its claim.

B.     **The Newco "Revenue Purchase Agreement."**

GRG and Newco entered into a "Revenue Purchase Agreement" dated August 14, 2024. GRG agreed to sell, assign and transfer three percent (3%) of all Future Receipts, with "Future Receipts" being defined as "all of the Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant" in payment of "existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors . . ."  ECF No. 3, Ex. 4, p. 1.  The maximum amount payable to Newco was to be $239,750, and Newco agreed to pay $175,000 minus an upfront fee of $7,050.  The agreement did not identify any specific contract rights or receivables in which Newco was purchasing interests.  Instead, the agreement contemplated that Newco would continue to be paid from all future receipts until such time as Newco recovered a set amount.

Section 1.10 and other provisions of the Newco agreement state that the amounts payable to Newco did not represent loan repayments and did not represent the payment of interest.  Section 1.10 stated, however, that if a court determined otherwise, and if it determined that Newco had charged interest at a rate that was higher than legally permitted, then Newco "shall promptly refund to Merchant any interest received by [Newco] in excess of the maximum lawful rate."

GRG agreed to make fixed weekly payments of $7,493 to Newco.  An attached "Offer Summary" estimated that it would take 32 weeks for the maximum amount to be paid to Newco. The difference between the amount paid by Newco and the amount to be paid to Newco was described in that same attachment as a "Finance Charge."  The attachment also stated that the Finance Charge was equivalent to an estimated annual percentage rate return of 122.81%, though the agreement disclaimed that such amount should be treated as an interest rate.

GRG repaid $152,861 to Newco, which was less than the maximum amount payable under the agreement ($239,750) and less than the amount actually paid by Newco ($175,000 minus the upfront fee of $7,050). On September 30, 2025 (after the filing of the Amended Complaint), Newco filed a proof of claim against GRG (Claim No. 19-1) in the amount of $120,403.20, which includes a claim for the amount that Newco did not recover ($86,889) plus other unspecified charges. Newco contends that its claim is secured by all assets of GRG.

## C.      The Square Advance "Standard Merchant Cash Advance Agreement."

Square Advance entered into a Standard Merchant Cash Advance Agreement dated September 26, 2024 with GRG and with non-debtor entities named Intermix, LLC and Binome, Inc. Square Advance agreed to pay $125,000 (minus an up-front fee of $5,000) for the purchase of $174,875.00 of Receivables, which were stated to represent an estimated 4% of future Receivables. "Receivables" was defined as all payments made by customers or other third-party payors in exchange for goods or services. No specific Receivables were identified as having been sold. Instead, the agreement treated Square Advance as having purchased a $174,875 share of all future Receivables. The obligations of the three parties identified as Merchants were not stated or computed separately. The Merchants agreed (apparently on a collective basis) to make weekly payments of $6,725.97 per week. An Addendum to the contract stated that "Early Payoffs" would be permitted such that the receipt of $143,750 by Square Advance would be treated as full payment if received on or before October 26, 2024, and the receipt of $150,000 would be considered full payment if received on or before November 25, 2024. The Debtors allege that the implied term of the Square Advance agreement was 26 weeks and that the implied interest rate was 132.673%.

GRG paid $99,509 to Square Advance pursuant to the agreement, which is less than the amount paid by Square Advance and less than the total amount that Square Advance was to recover

under the contract.  On October 3, 2025 (after the filing of the Amended Complaint) Square Advance filed a proof of claim (Claim No. 30-1) in the amount of $76,866.23.  It contends that the claim is a secured claim.

**D.       The Smart Business "Sale of Future Receipts Agreement."**

GRG and Smart Business entered into a Sale of Future Receipts Agreement dated December 6, 2024.  It stated that Smart Business would purchase $350,000 of the monies that GRG received in the future from customers and other third-party payors, which was estimated to represent 3.86% of future receipts.  Smart Business agreed to pay $250,000 minus an upfront fee of $12,500.  GRG agreed to make weekly payments of $10,938 to Smart Business.  The Debtors allege that the expected repayment period was 32 weeks and that the implied rate of return for Smart Business was 112.69%.

GRG paid $54,252 to Smart Business, which is less than the amount that Smart Business originally paid and less than the amount specified in the parties' agreement.  On October 3, 2025, Smart Business filed a proof of claim (Claim No. 25-1), contending that GRG owes it $296,400.05, though the filing did not break down the components of the claim.  Smart Business contends that its claim is a secured claim.

**Discussion**

**I.       Whether the Debtors Have Pleaded a Valid Fraudulent Transfer Claim.**

Section 548 of the Bankruptcy Code permits a trustee to assert fraudulent transfer claims with respect to transfers that were made and/or obligations that were incurred within two years prior to a bankruptcy filing if the Debtors did not receive "reasonably equivalent value" in exchange and if the Debtors were insolvent (or met other financial tests) at the time the relevant obligations were incurred or the relevant transfers were made.  11 U.S.C. § 548.  The transactions

17

between the Debtors and each of the Defendants occurred in 2024, less than two years prior to the Debtors' bankruptcy filings. Section 1107 of the Bankruptcy Code provides that in a Chapter 11 case a debtor in possession has the powers that a trustee would otherwise have, and this includes the rights that a trustee would have to file claims under Section 548. *See* 11 U.S.C. § 1107(a).

The Debtors have also invoked Section 544 of the Bankruptcy Code in support of their fraudulent transfer claims. *See* Amended Complaint ¶ 6. Section 544(a) permits a trustee (or a debtor in possession in a Chapter 11 case) to assert fraudulent transfer claims under state law that a debtor's creditors otherwise could have asserted. 11 U.S.C. § 544(a). New York's Debtor and Creditor Law permits a creditor to obtain the avoidance of an obligation or a transfer if a debtor did not receive reasonably equivalent value in return and if the debtor was insolvent at the time. *See* N.Y. Debtor & Creditor Law § 274(a).

The Amended Complaint appears at different times to challenge the validity of the entire obligations that the Debtors incurred, of the individual transfers that the Debtors made pursuant to those obligations, of the remaining claims of the Defendants, of the Confession of Judgment executed in favor of Itria and of the judgment that Itria obtained pursuant to that Confession of Judgment. *See* Amended Complaint ¶¶ 74, 76-78, 81-84, 74-78, 81-84, 87-90, 93-96, 99-102, 146, 213. I will address each of the possibilities to identify the claims that are properly asserted as fraudulent transfer claims.

### A.    Avoidance of the Underlying Obligations and Transactions in Their Entirety On the Theory That the Original Transactions Were Fraudulent Transfers.

The Amended Complaint alleges that the Debtors either received no value or less than reasonably equivalent value in their transactions with the Defendants and that the Debtors were insolvent at the times the obligations were incurred and/or when the transfers were made. If the

Debtors prove these allegations then the entire transactions would be declared void, and the parties would be returned to the positions that they would have occupied if the transactions had never occurred.  *See* 5 Collier on Bankruptcy ¶ 548.10 (16th ed. 2026) (avoidance amounts to the nullification of a transaction, which means that the transaction "is retroactively ineffective" and that the transferee legally acquired no rights or property, so that the trustee may act as though the transaction did not occur.)

Itria and the other Defendants argue that to date the Debtors have repaid less than the amounts that the Defendants paid to the Debtors, and therefore that no valid fraudulent transfer claim may be asserted.  However, Section 548 of the Bankruptcy Code, and Section 274(a) of the New York Debtor and Creditor Law, allow a fraudulent transfer claim to be asserted not only with respect to actual cash transfers that have occurred to date, but also with respect to "any obligation" incurred by a debtor for less than a reasonably equivalent value.  *See* 11 U.S.C. § 548; 5 Collier on Bankruptcy ¶ 548.03 (16th ed. 2026) ("unlike Section 547, Section 548 extends beyond simple transfers and enables avoidance of obligations as well"); N.Y. Debtor & Creditor Law § 274(a). Itria has argued that the Debtors have only challenged "transfers" and not the "obligations" that were incurred, but I do not believe that is a fair reading of the Amended Complaint.  *See, e.g.,* Amended Complaint ¶ 213 ("[t]he obligations secured by the liens of the MCA Lenders and Negotiation Parties are subject to avoidance as a fraudulent conveyance and preserved for the benefit of the Estates.").

Itria and the other Defendants also argue that they provided "consideration" in the form of the payments that they made to the Debtors.  For purposes of a fraudulent transfer claim, however, the issue is whether the amount of the consideration that was paid constituted "reasonably equivalent value" for the obligations that the Debtors incurred.  The Debtors have alleged that

there was an enormous disparity between the amounts the Defendants paid and the amounts that the Defendants were entitled to receive under their contracts. *Id.* ¶ 42. The Defendants argue that the amounts paid were reasonable despite these disparities, but the reasonableness of the payments and other questions as to whether "reasonably equivalent value" was paid are factual issues that are not appropriate for resolution on a motion to dismiss.

Itria contended at oral argument that the Debtors' fraudulent transfer claims are entirely dependent on the success or failure of the Debtors' usury claims, but that plainly is not the case to the extent that the Debtors challenge the entirety of the underlying transactions on fraudulent transfer grounds. The Debtors may plausibly argue that the amounts paid by the Defendants did not constitute "reasonably equivalent value" regardless of whether the transactions were loans or sales, and regardless of whether any usury claim could separately be asserted.

The Debtors conceded at oral argument that if the entire transactions were avoided on fraudulent transfer grounds, then the Defendants would have unsecured claims to recover any amounts that they originally paid to the Debtors and that have not already been recovered through payments made by the Debtors. *See* 11 U.S.C. § 548(c).

## B.    May the Debtors Use Fraudulent Transfer Theories to Attack the Itria Confession of Judgment Standing Alone?

The Confession of Judgment was executed as part of the original Itria transaction. At times it appears that the Debtors seek to undo the Confession of Judgment standing by itself. If the Debtors seek to undo only part of the original Itria transaction on fraudulent transfer grounds, that result would not be permitted. Fraudulent transfer is a basis to avoid a transaction, not a basis to reform it. *In re People's Power & Gas, LLC*, 608 B.R. 333, 338-9 (Bankr. D. Conn. 2019). If a

material part of the original deal was improper as a fraudulent transfer, the entire thing would come undone, not just a part of it.

###   C.    May the Debtors Seek to Undo Individual Payments and/or the Itria Judgment on the Grounds that the Debtors' Failures to Assert Their Available Usury Defenses Were Themselves Fraudulent Transfers?

There is a separate issue as to whether the Debtors might have committed fraudulent transfers by their failures to assert usury defenses at the times when individual payment obligations came due and (in Itria's case) at the time Itria sought the entry of judgment against the Debtors.

New York law permits a limited liability company to assert criminal usury defenses as to obligations that remain unpaid. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 333 (2021) (hereafter cited as "*Adar Bays*"). The Debtors have acknowledged that as of today they would only have the right (on usury grounds standing alone) to challenge the obligations to the Defendants that are still outstanding. The Debtors contend, however, that at the times when prior payments came due the Debtors had the right to assert usury defenses and to avoid making those payments, but that the Debtors failed to do so. The Debtors also claim that, at the time that Itria filed the Confession of Judgment and sought the entry of judgment in its favor, the Debtors had the right to assert a usury defense, but they did not do so. The Debtors' counsel has argued that the Debtors were insolvent at all of these times, and that the Debtors' failures to assert usury defenses at these prior times were waivers of valuable rights that operated to the benefit of the Defendants and for which the Debtors received no further compensation. The Debtors therefore allege that the failures to assert defenses, the resulting waivers, and the individual transactions in which the waivers were effected, should be undone as fraudulent transfers. If valid, this theory would mean that all of the individual payments to the Defendants, and the Itria judgment, would potentially be undone. The parties would be restored to the positions they would have occupied if

valid usury defenses had been asserted after the transactions initially closed but before the Debtors made any repayments.

The Bankruptcy Code broadly defines the term "transfer" as including "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with" property or an interest in property. 11 U.S.C. § 101(54). A release of claims qualifies as a "transfer" under this broad definition. *Carmel v. River Bank Am. (In re FBN Food Servs)*, 185 B.R. 265, 273 (N.D. Ill. 1995) ("[w]ithout doubt, causes of action and claims possessed by the debtor are property of the estate" and the release of such claims constituted a transfer); 5 *Collier on Bankruptcy* ¶ 543.03 ("transfers" include "transactions in which the debtor terminates or modifies intangible property rights, such as contract rights or releases of causes of action"). Failures to assert rights, or disclaimers of rights, may also constitute transfers. *United States v. Kapila*, 402 B.R. 56, 63 (S.D. Fla. 2008) (election with respect to net operating losses entailed the waiver of a present tax refund and constituted a "transfer").

The satisfaction of a valid debt is deemed to constitute reasonably equivalent value for fraudulent transfer purposes. If, however, the obligations to the Defendants were loans that were subject to valid criminal usury defenses at the times when the Debtors made prior payments, and if the Debtors instead made the payments without asserting those available defenses, then it is plausible for Plaintiffs to contend that the Debtors made transfers to the Defendants that did not satisfy valid outstanding debts and for which the Debtors did not receive reasonably equivalent value. The Debtors also failed to assert usury defenses when Itria sought the entry of judgment, and Itria itself argues that it received additional rights as the result of the Judgment entered in its favor, in that Itria acquired the right to full payment of the amounts that remained owing to it and foreclosed the Debtors (in the absence of a fraudulent transfer claim) from asserting any further

22

usury defenses.  If, as alleged, the Debtors were insolvent at the times of these transfers, then the transactions amounted to fraudulent transfers that may be undone.

This theory would require proof that the Debtors had valid usury defenses that could have been asserted at the relevant times.  Itria argued during oral argument that allowing the Debtors to pursue such a claim would impermissibly permit an end-run around the limits that state law imposes on the assertion of usury defenses.  I do not agree.  State law provides that the Debtors' prior failures to assert usury defenses amounted to a termination of the Debtors' rights to challenge their prior payments and other transfers on usury grounds.  There is a separate issue as to whether those losses or waivers of state law rights amounted to (or were part of) fraudulent transfers, and whether they therefore may be undone.  Any transfer that is undone on fraudulent transfer grounds amounts to the invalidation of something that would otherwise be valid under state law.  A litigation settlement is normally binding under state law, for example, but it may be undone if it amounted to the transfer of property without reasonably equivalent value at a time when the debtor was insolvent.  The nullification of the Debtors' prior transfers on fraudulent transfer grounds, based in part on the fact that the Debtors had valid defenses that they failed to assert at the time, would not offend state law any more than any other successful fraudulent transfer claim would offend state law.

There may be issues that the parties have not yet fleshed out, but at this stage of the proceedings I will permit the Debtors to pursue fraudulent transfer claims on this basis.

### D.    Whether Avoidance of the Itria Judgment on Fraudulent Transfer Grounds Is Barred by *Res Judicata* or by the *Rooker-Feldman* Doctrine.

Itria argues that the Debtors' fraudulent transfer claims are barred by *res judicata* and by the *Rooker-Feldman* doctrine.  I disagree.

A fraudulent transfer claim under Section 548 exists only after a bankruptcy petition has been filed. The Debtors therefore did not own the Section 548 claims, and could not have asserted them, at the time of the Itria transaction or at time the state court judgment was entered in favor of Itria. The Section 548 claim therefore is not one that was actually litigated, or that could have been litigated, at the time the state court proceeding was filed or at the time the state court judgment was entered. The state court judgment cannot reasonably be treated as *res judicata* with respect to claims that did not yet even exist when the judgment was entered. *See Preston v. Nationstar Mortg. LLC (In re Preston)*, No. 24-21009 (JJT), 2025 Bankr. LEXIS 954, at *16-17 (Bankr. D. Conn. Apr. 16, 2025) (determining that a prior state court judgment did not bar a fraudulent transfer claim that was not and could not have been litigated in the prior state court action); *see also In re Fitzgerald*, 237 B.R. 252, 265 (Bankr. D. Conn. 1999) (holding that claim preclusion doctrines were inapplicable since, among other reasons, a fraudulent transfer claim was not and could not have been litigated in a prior foreclosure action).

In addition, a debtor in possession is not limited to the pre-petition debtor's own rights when a debtor in possession files a fraudulent transfer action. There are some causes of action (contract claims, for example) that a trustee or a debtor in possession inherits from a pre-petition debtor and as to which the trustee and debtor in possession are subject to all of the defenses (including claim preclusion) that would bind the pre-petition debtor. Fraudulent transfer and other avoidance actions are different. Those claims never belonged to the pre-petition debtor. They are claims that may be asserted only by a trustee, or by a debtor in possession who has the powers and responsibilities of a trustee in a Chapter 11 case. Claims under Section 548 are not derivative of the pre-petition debtor's own rights and they are not subject to defenses that could be asserted against the pre-petition debtor. *See Allegaert v. Perot*, 548 F.2d 432, 436 (2d Cir. 1977) (holding

that avoidance action claims are "statutory causes of action belonging to the trustee, not to the bankrupt, and the trustee asserts them for the benefit of the bankrupt's creditors" and that a trustee was not subject to a debtor's prepetition agreement to arbitrate such claims); *Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784, 790 (Bankr. S.D.N.Y. 2008) (holding that fraudulent transfer claims are "statutory claims belonging to the trustee and are not claims derivative of the debtor's own rights"); *Buffalo Metro. Fed. Credit Union v. Mogavero (In re Cooley)*, No. 00-CV-0345E(M), 2001 U.S. Dist. LEXIS 1513, at *9 (W.D.N.Y. February 9, 2001) (holding that a trustee acts as a representative of the estate when exercising an avoiding power and "is not limited to the rights of the bankrupt").

The whole purpose and effect of a fraudulent transfer claim is to nullify transfers and obligations to which the pre-petition debtor otherwise would be legally bound. It would be absurd, in considering a fraudulent transfer claim, to contend that a judgment is immune from attack just because the judgment bound the pre-petition debtor. *See, e.g., Dobin v. St. Andrew's Ests. 26, LLC (In re Hernandez)*, No. 22-14525-CMG, 2025 Bankr. LEXIS 2318, at *24-26 (Bankr. D.N.J. Sept. 15, 2025) (holding that a trustee asserting an avoidance action claim acts for creditors and should be treated as a different party from the prepetition debtor for purposes of the application of *res judicata* and claim preclusion doctrines); *In re Cooley,* 2001 U.S. Dist. LEXIS 1513, at *9 (holding that prior statements by a debtor were not binding on a trustee who asserts an avoidance action claim because the trustee is not limited to the rights of the debtor in asserting such a claim). The Debtors in this case are debtors in possession who have the power and responsibility under Section 1107 to assert Section 548 claims on behalf of the estate, and in doing so they should not be subject to any restraints that would not apply to an independent trustee. *In re Bethlehem Steel Corp.*, 390 B.R. at 790.

The Debtors have also invoked Section 544 of the Bankruptcy Code in support of their fraudulent transfer claims.  Amended Complaint ¶ 6.  Claims asserted under Section 544 are claims that otherwise would belong to the Debtors' creditors.  *In re Teligent, Inc.*, 307 B.R. 744, 749 (Bankr. S.D.N.Y. 2004).  Those creditors were not parties to the state court action in which the judgment in favor of Itria was entered, and so the state court judgment cannot be considered *res judicata* with respect to the claims asserted under Section 544.

The fraudulent transfer claims also do not run afoul of the *Rooker-Feldman* doctrine.  The *Rooker-Feldman* doctrine derives from the Supreme Court's decisions in *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413, 415-16 (1923), and *District of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462, 486-87 (1983), as clarified by the more recent decision in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293-94 (2005).  The gist of the *Rooker-Feldman* doctrine is that federal courts should not conduct the kind of review of a state court judgment that ought to be conducted by the state courts who have appellate jurisdiction.  *Phila. Entm't & Dev. Partners, LP v. Dep't of Revenue (In re Phila. Entm't & Dev. Partners, LP)*, 879 F.3d 492, 498 (3d Cir. 2018).  The fraudulent transfer claims that are asserted here do not fit that description.  The fraudulent transfer claims did not belong to the Debtors at the time of the state court judgment, and they seek to undo transactions on grounds that do not require any review of the state court judgment itself.  Under these circumstances the *Rooker-Feldman* doctrine is not applicable.  *Id*. at 498-502 (holding that a fraudulent transfer claim does not involve a prohibited "appellate review" of a state court judgment or a relitigation, in federal court, of matters already litigated in the state court, and that the *Rooker-Feldman* doctrine does not bar the assertion of a fraudulent transfer claim); *In re Preston*, 2025 Bankr. LEXIS 954, at *10-11 (holding that the *Rooker-Feldman* doctrine does not apply to avoidance action claims and that the Bankruptcy Code authorizes a court to vitiate a state

court judgment on fraudulent transfer or preference grounds); *Pryor v. Town of Smithtown (In re Jadeco Constr. Corp.)*, 606 B.R. 169, 184-5 (Bankr. E.D.N.Y. 2019) (collecting cases and holding that "[c]ourts examining the reach of the *Rooker-Feldman* doctrine have concluded that it has little to no application in the context of avoidance actions in the Bankruptcy Code"). Itria has not cited any authority to the contrary.

## II.   Claims Pursuant to Section 502(d).

Section 502(d) of the Bankruptcy Code states that any claim of a party "that is a transferee of a transfer" that is avoidable under sections 544 or 548 must be disallowed "unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable . . ." 11 U.S.C. § 502(d). Defendants' motions to dismiss the Debtors' claims under Section 502(d) of the Bankruptcy Code depend on Defendants' arguments that all of the Debtors' fraudulent transfer claims should be dismissed. I have denied the motions to dismiss some of the fraudulent transfer claims for the reasons stated above, and so there is at this stage no basis to dismiss the claims under Section 502(d).

## III.   Whether The Debtors Have Pleaded Valid Usury Claims.

Violations of the New York usury laws carry heavy consequences. Usurious transactions are void. N.Y. Gen. Obl. Law § 5-511. A lender who violates usury laws may be barred even from recovering the amount of its original loan and may be subject to other penalties as well. *See Adar Bays,* 37 N.Y.3d at 326 (citing "the 300-year-old rule in New York that, where usury is established, the transaction is entirely void, preventing recovery of both principal and interest.") Corporations and limited liability companies are barred from asserting "civil" usury defenses under New York law, but they are not barred from asserting that transactions violate the 25% criminal usury limits in the Penal Law. *See* N.Y. General Obligations Law § 5-521(1); N.Y.

Limited Liability Company Law § 1104(a) (permitting a limited liability company to assert a defense of criminal usury but otherwise barring such a company from interposing a usury defense). New York courts have held that these provisions allow corporations and limited liability companies to assert criminal usury as a defense to a claim to recover a debt, but that corporations and limited liability companies may not seek "affirmative" relief on usury grounds. *Intima-eighteen, Inc. v. A.H. Schreiber Co.*, 172 A.D.2d 456, 457-8 (1st Dep't. 1991).

The Defendants have argued that the Amended Complaint impermissibly seeks affirmative relief on grounds of usury and that the Debtors' stand-alone usury claims should be dismissed. Itria argues more generally that its transaction was a sale of receivables as a matter of law and that the Debtors have waived arguments to the contrary or otherwise are barred from arguing the contrary. The other Defendants have not sought dismissal of the contentions that their transactions were loans, though they have made clear that they disagree with the Debtors' claims.

### A.    Whether The Debtors Seek Permitted Forms of Relief.

The Amended Complaint asks that the Itria transaction be voided on grounds of usury and that all of the Debtors' prior payments be returned. However, the Debtors acknowledge that New York law would not permit them to seek such relief on usury grounds alone. The Debtors' challenges based on fraudulent transfer claims may proceed as described above (including the Debtors' contentions that they had valid usury defenses that were waived and that the waivers constituted fraudulent transfers), but the Debtors' contentions that prior payments should be undone, based on usury defenses standing alone, must be dismissed.

The Defendants also argue that the Amended Complaint seeks declaratory relief as to the Debtors' remaining obligations and that this also was a form of "affirmative" relief. There is support for that proposition. *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp.

3d 237, 254 (S.D.N.Y. 2022)*; Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21-CV-9528 (KMK), 2022 WL 4368114, at *3-4 (S.D.N.Y. Sept. 20, 2022).  However, since the filing of the Amended Complaint the Defendants have filed proofs of claim.  Defendants acknowledged at oral argument that the rule against "affirmative" relief does not bar the Debtors from challenging the proofs of claim on usury grounds.  There is no reason why the Debtors' objections cannot be asserted in this adversary proceeding or why they cannot do so through the further amendments to the pleadings that will be required by this Decision.  *In re Heritage Collegiate Apparel*, No. 24-47922 (TJT), 2026 Bankr. LEXIS 116, at *15, 18-19 (Bankr. E.D. Mich. Jan 20, 2026).

In the absence of a fraudulent transfer claim, the Judgment that Itria obtained would bar the Debtors from challenging their obligations to Itria on usury theories standing alone, as the judgment would be *res judicata* as to the usury defenses that the Debtors could have asserted.  As explained above, however, the Debtors (as debtors in possession) have the same rights to assert fraudulent transfer claims as a trustee would have.  That includes claims that the transfers that the Debtors previously made, and the Debtors' failures to assert usury defenses at the times those transfers were made, amounted to fraudulent transfers for the benefit of Itria.  The Debtors, as debtors in possession, may assert those fraudulent transfer claims regardless of whether the pre-petition Debtors would have been able to do so.  Similarly, the Debtors' prior payments and waivers may be undone on fraudulent transfer grounds even if they could not presently be undone based on usury theories standing alone.

### B.    Usury Generally.

A transaction is not subject to usury laws unless the underlying transaction is properly characterized as a "loan" or as a "forbearance," and unless the benefits received by the non-debtor are properly characterized as "interest."  *Seidel v. 18 East 17th Street, Inc.*, 79 N.Y.2d 735, 744

(1992) ("[u]sury laws apply only to loans or forbearances"); *LG Funding, LLC v. United Senior Props. of Olathe, LLC,* 181 A.D.3d 664, 665 (2d Dep't. 2020) ("[t]he rudimentary element of usury is the existence of a loan or forbearance of money, and where there is no loan, there can be no usury, however unconscionable the contract may be").  Not all transactions can be so easily characterized, however, and for so long as there have been strict usury laws the courts have had to struggle with the question of whether a party's gains on a particular transaction represent "interest" on a loan or instead represent profits on an at-risk investment.  The courts' task is made immensely more complicated by the nearly boundless ingenuity of commercial parties and their counsel, who readily use every tool at their disposal to avoid the usury laws.  *Quackenbos v. Sayer*, 62 N.Y. 344, 346 (1875) (observing, more than 150 years ago, that "[t]he shifts and devices of usurers to evade the statutes against usury, have taken every shape and form that the wit of man could devise . . .")

Historically, the most common way in which parties have attempted to evade usury laws is by characterizing their transactions as sales rather than as loans.  *See, e.g., Adar Bays,* 37 N.Y.3d at 342 (2021) ("a common tool of lenders in the 1800s to avoid enforcement of usury law penalties – civil or criminal – was to disguise the loan as a 'sale of choses in action' exempted from the law"); *Quackenbos,* 62 N.Y. at 346 (recognizing that "the most usual form of usury was a pretended sale of goods"); *Schermerhorn v. Talman*, 14 N.Y. 93, 115-16 (1856) ("[t]he common expedient resorted to, therefore, to evade the statute is to give to the transaction the form of a sale, instead of a loan; a disguise which, whenever it can be discovered, is stripped off by the courts and the transaction declared usurious").  Often, of course, a sale is exactly what it purports to be.  At other times, though, the form that a transaction takes may represent nothing more than an effort to disguise its true nature.  *See Bishop v. Rider*, 143 Misc. 291, 295 (2d Dep't 1932), *aff'd*, 261 N.Y.

512, 185 N.E. 717 (1933) (observing that "[w]herever you find usury, you will find a subterfuge

of one kind or another.  Circumvention is usually resorted to to give the color of legality.")

New York courts have long been committed to the principle that "there is no contrivance

whatever by which a man can cover usury" and that "no subterfuge shall be permitted to conceal

it from the law." *Knickerbocker Life Ins. Co. v. Nelson*,  78 N.Y. 137, 149 (1879).  For this reason,

it is well-established in New York that in considering whether a transaction is usurious a court

must consider the transaction in its totality and must judge it by its true character, rather than by

the form it purports to take or by the names, labels or characterizations that the parties have elected

to apply to it.  *See Adar Bays,* 37 N.Y.3d at 334 (2021) ("[w]hen determining whether a transaction

is a loan, substance – not form – controls"); *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC,*

No. 22-1885-CV, 2023 U.S. App. LEXIS 14241, at *2 (2d Cir. June 8, 2023) (hereafter cited as

"*Fleetwood (2d Cir.)*") ("[u]nder New York law . . . 'substance' – not form – controls' when a

court determines whether a transaction is a loan") (citations omitted); *LG Funding, LLC*, 181

A.D.3d at 665; *Abir v. Malky, Inc.*, 59 A.D.3d 646, 649 (2d Dep't. 2009); *Hall v. Eagle Ins. Co.*,

151 A.D. 815, 826 (1st Dep't 1912), *aff'd*, 211 N.Y. 507 (1914).  Whether a particular transaction

is merely a cover for usury is ordinarily a question of fact that is reserved for trial.  *Adar Bays*, 37

N.Y.3d at 339; *Beals v. Benjamin*, 33 N.Y. 61, 67 (1965); *Hicki v. Choice Capital Corp.*, 264 A.D.

2d 710, 711 (2d Dep't. 1999).

New York courts have issued many decisions with respect to whether particular merchant

cash advance transactions should be treated as loans or as sales of future receivables or receipts.

Itria argues that the prevailing rule is that such transactions are sales and not loans, but the cases

that Itria has cited for that proposition are not up to date.  *See IBIS Capital Group, LLC v. Four

Paws Orlando LLC*, 2017 WL 1065071, at *3 (Sup. Ct. Nassau Cty. Mar. 10, 2017); *Colonial

31

*Funding Network, Inc. v. Epazz, Inc.*, 252 F. Supp. 3d, 274, 280 (S.D.N.Y. 2017); *Principis Cap., LLC v. I Do, Inc.,* 160 N.Y.S.3d 325, 327 (App. Div. 2022); *Womack v. Cap. Stack, LLC*, No. 18-cv-04192 (ALC), 2019 WL 4142740, at *7 & n. 9 (S.D.N.Y. Aug. 30, 2019).  At one time, "[o]nly a small number of bankruptcy courts and commercial law scholars had begun challenging the prevailing characterization of these transactions as sales by looking beyond the contractual language to deeper commercial realities."  K. Bruce, *Revenue-Based Finance in Bankruptcy and Beyond*, 45 Bankruptcy Law Letter (April 2025).  However, "[t]he ground has shifted substantially in the years that have followed."  *Id.*

Many decisions over the past few years have held that particular merchant cash advance transactions were in reality loans and not sales.[2]  Federal court decisions, particularly in this district, have tended to find that the transactions before them were loans as a matter of law, or that the relevant complaints asserted valid claims seeking such relief.  New York state court decisions have produced more mixed results, but at least one New York State court has observed that the recent federal court decisions are "compelling" in the conclusions that they have reached.  *See Hi Bar Capital LLC v. Parkway Dental Services, LLC*, 2022 WL 3757589, at *3 (Sup. Ct. Kings Cty.

---

[2]    *See, e.g., Fleetwood Servs., LLC v. RAM Capital Funding, LLC,* No. 20-CV-5120 (LJL), 2022 U.S. Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022) (hereafter cited as "*Fleetwood (S.D.N.Y.)*"), *aff'd sub nom. Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No. 22-1885-CV, 2022 U.S. Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022), *aff'd*, 2023 U.S. App. LEXIS 14241 (2d Cir. June 8, 2023); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 249 (S.D.N.Y. 2022) (hereafter cited as "*Haymount*"); *New Y-Capp v. Arch Cap. Funding, LLC*, No.18-CV-3223 (ALC), 2022 WL 4813962 (S.D.N.Y. Sept. 30, 2022); *J.P.R. Mech. Inc. v. Radium2 Cap., LLC (In re J.P.R. Mech Inc.)*, No. 19-23480 (DSJ), 2025 Bankr. LEXIS 1319 (Bankr. S.D.N.Y. May 30, 2025); *In re Williams Land Clearing, Grading, & Timber Logger, LLC*, No. 22-02094-5-PWM, 2025 WL 1426503 (Bankr. E.D.N.C. May 16, 2025); *In re M Design Vill, LLC*, No. 24-21406 (MEH), 2025 WL 2088887 (Bankr. D. N.J. July 24, 2025); *In re Shoot the Moon, LLC*, 635 B.R. 797 (Bankr. D. Mont. 2021); *LG Funding, LLC, LLC*, 181 A.D.3d at 664.

Aug. 25, 2022) (observing that "[r]ecently, Federal courts have engaged in a more thorough and exacting scrutiny of merchant cash advance agreements, looking at the agreements in a holistic and comprehensive manner, and the conclusions they have reached are compelling.")

Consideration of these prior decisions leads to a few important observations about the standards that should be applied in considering the usury contentions that the parties have made.

First, many New York courts that have considered merchant cash advance transactions have started from the proposition that in order to be a "loan" there must be an "absolute" right to repayment. This contention derives from a statement in *Rubenstein v. Small*, 273 App. Div. 102, 104 (1st Dep't. 1947), that "[f]or a true loan it is essential to provide for repayment absolutely and at all events or that the principal in some way be secured as distinguished from being put in hazard." *Id.* Itria urges the Court to conclude that the Itria transaction cannot be a "loan" because Itria did not have full recourse against the Debtors in all conceivable circumstances and therefore did not have an "absolute" right of repayment, and also because Itria's recovery was subject to a theoretical contingency. I do not believe that Itria's contentions are correct statements of the holding in *Rubinstein* or of how the New York courts have applied the usury laws.

In the real world, limited recourse does not itself suggest that a transaction is something other than a loan. The quoted sentence from the *Rubinstein* decision recognized that a transaction may be a loan if there is an absolute right of repayment "or" if the principal is in some way "secured as distinguished from being put in hazard." There are scores of non-recourse and limited recourse loans under which a lender's recovery is secured by a particular asset and in which the lender does not have full recourse against the buyer. The 1978 Bankruptcy Code even has a provision that addresses such loans. *See* 11 U.S.C. § 1111(b). In some such transactions the lender's principal is "put in hazard," to use the language of *Rubinstein*; a good example is a loan in which the lender's

sole recourse is to the proceeds of a judgment on a litigation claim that has a highly uncertain outcome. But at other times a non-recourse loan may be fully secured and may involve no real risk other than the types of risks that any lender takes.

Non-recourse loans in which the principal is "secured as distinguished from being put in hazard" are commonly regarded both legally and commercially as "loans," as well they should be. John F. Hilson and Steohen L. Sepinuck, *A "Sale of Future Receivables: Criminal Usury in Another Form*," 9 The Transactional Lawyer 1, 3 (Aug. 2019) (if absolute liability were the sole standard, then "[e]ven an over-secured, non-recourse loan would be exempt from the protections against usury," though "there is no good reason why that should be the case.") No lender's recovery is ever absolutely assured, after all. A lender in an ordinary unsecured loan transaction takes the risk of the borrower's insolvency. A lender who does not have recourse against a debtor, but who does have the right to recover from the borrower's property, may actually have a stronger assurance of recovery than an unsecured lender would have. Both types of transactions are normally regarded as "loans," even though the expected repayment sources may differ.

It also would be far too easy to evade usury laws if the only thing a lender needed to do to negate usury defenses would be to limit its recourse against a borrower in trivial ways, or to make its recovery contingent on highly remote or even nonexistent risks. If substance (not form) is to be determinative, as it is supposed to be, then a court must consider the scope and likelihood of the "risks" that a party has allegedly taken, and whether such risks are real or instead are just disguised efforts to evade the usury laws. *See Fleetwood (S.D.N.Y.),* 2022 U.S. Dist. LEXIS 100837, at *32. An agreement should not be considered a purchase of accounts receivable, as opposed to a loan, if there is not "a real risk on the part of the [buyer] that the [seller] may have reduced revenues or even no revenue." *Landmark Funding Grp. LLC v. Alt. Materials LLC*, No.

34

534708/2002, 2024 N.Y. Misc. LEXIS 852, at *7 (Sup. Ct. Feb. 29, 2024); *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 452 (S.D.N.Y. 2022) (It is not sufficient that an "agreement is stated to have a reconciliation provision, an indefinite term and be non-recourse if those provisions are illusory").  A loan whose repayment is subject to a theoretical contingency may nevertheless be a "loan," and may be usurious, "where the contingency selected is so improbable as to convince the court or the jury that there was no real hazard and that the repayment of the loan was made subject to an improbable contingency merely to escape the statute against usury."  44B Am Jur2d Interest and Usury § 103.  A theoretical "contingency" that is not real therefore does not suffice.  *See, e.g., Echeverria v. Estate of Lindner*, No. 018666/2002, 2005 N.Y. Misc. LEXIS 894, at *22-23 (Nassau Cty. Mar. 2, 2005) (holding that an advance of funds that was to be recovered only from a future judgment involved no real risk in light of the nature of the litigation claim at issue in that particular case, and that it was in reality a loan that violated usury laws); *In re Minor*, 443 B.R. 282, 287 (Bankr. W.D.N.Y. 2011) (holding that a pre-settlement assignment of future litigation proceeds was "suspect" on the ground, among others, that it appeared in reality to be a usurious loan); *see also* Hilson & Sepinuck, 9 The Transactional Lawyer at 4 ("A loan that is usurious except when pigs fly, is usurious.")

In order to be exempt from usury laws, the kind of risk that a funder takes must also be different from the risks that every lender takes, and for which lenders can only demand compensation at a rate of interest that the law permits.  72 N.Y. Jur. 2d Interest and Usury, § 86 (noting that a risk of loss that warrants an exception from usury laws "is to be distinguished from the risk of nonpayment that is inherent in every loan and that may only be compensated for by statutory interest").  The long-settled general rule has been summarized in one treatise as follows:

> An exception to the usury laws pertains where the principal is put at risk, and thus more than the legal rate of interest may be received, the excess in such case being allowed as a consideration for the risk of the principal in addition to the interest which is the consideration for the forbearance of the debt. To come within that exception to the usury laws, however, the risk of principal must be a substantial one. That is, it must have formed a real ingredient in the contract and the true consideration for the additional profit stipulated for, being clearly and beyond doubt not colorable or intended only as a cover for exacting more than the legal rate of interest for the mere use of the principal. There must be some greater hazard than that the borrower will fail to repay the loan or that the security will depreciate in value.

44B Am Jur2d Interest and Usury § 104. The risk that a borrower might die or become insolvent, for example, is a risk that every lender takes, but it is not the sort of risk or contingency that justifies an exemption from the usury laws. *See Colton v. Dunham*, 2 Paige Ch. 267, 273 (1830) ("the risk of loss by the death or insolvency of the borrower is not such a contingency or hazard as will take the case out of the operation of the [usury] statute"); *Vee Bee Service Co. v. Household Finance Corp.*, 51 N.Y.S.2d 590 (N.Y. Cty. 1944) (same).

Courts that adopt a mechanical focus on the existence of an "absolute" right to repayment (which is only part of the definition set forth in *Rubinstein*), and/or that focus mechanically on the existence of theoretical "contingencies" without assessing both the nature of those contingencies and whether those contingencies are substantial and realistic, are focused on form rather than substance, which is the opposite of what the New York Court of Appeals has commanded that courts do in applying the usury laws.

Second, New York courts have commonly considered three main factors in assessing whether a merchant cash advance transaction is, in reality, a loan as opposed to a sale: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy. *Fleetwood (2d Cir.),* 2023 U.S. App. LEXIS 14241, at *2. I will discuss each of these factors below, but it is

important to note that the three factors are neither exclusive nor decisive.  The aim of the court's inquiry ultimately is to determine the true character of the underlying transaction, and many other factors may be relevant.  *See Haymount*, 609 F. Supp. 3d at 247 ("while these three factors may be relevant to the analysis, they are far from dispositive"); *id.* at 249 (the 3 factors "are neither exclusive nor dispositive"); *Fleetwood (S.D.N.Y.),* 2022 U.S. Dist. LEXIS 100837, at *29-33 (holding that the three factors are a guide, but that the task is to evaluate the transaction as a whole by considering all relevant circumstances); *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21-cv-9606 (LGS), 2022 U.S. Dist. LEXIS 129032, at *18-19 (S.D.N.Y. July 20, 2022) (court explicitly considered other factors besides the three listed factors); *J.P.R. Mech. Inc.*, 2025 Bankr. LEXIS 1319 at *19 (holding that the three factors merely provide a guide to the analysis and do not necessarily dictate the conclusion).  Itria initially argued otherwise, but at oral argument Itria's counsel conceded that the cited factors are not exclusive and also are not decisive by themselves.

A court's consideration of the three factors, like a court's consideration of other aspects of the transactions, also should not be just a mechanical exercise, as though the three factors were just elements of form that should be toted on a scoresheet.  If a transaction has a fixed term, full recourse against the debtor, and no reconciliation provisions, for example, then certainly those factors would suggest that the transaction is really a loan.  But as already explained above, the fact that a purported "buyer" does not have recourse in all conceivable circumstances, or that a "buyer's" recovery is subject to a theoretical but not real risk, or that the buyer has taken a "risk" that in substance is just an ordinary credit risk, should not mean that a transaction is exempt from the usury laws.  The inquiry "is not a quantitative exercise susceptible to replication by a computer program, but a comprehensive and heavily contextual endeavor."  *CapCall, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 813 (Bankr. Mont. 2021).

37

Third, it ought to be clear (though sometimes it appears to be overlooked) that when a court is asked to determine whether, in substance, a transaction was actually a sale or a loan, the court should not begin and end its inquiry by considering only whether the transaction has all of the ordinary characteristics of a loan.  In deciding what the substance of transaction really is, a court must also consider whether the transaction has the features one would expect to see in a sale.  A court that does not do so has only examined half of the relevant question.

### C.    The Debtors Have Plausibly Alleged That the Itria Transaction Was A Loan.

Itria argues that its transaction was a valid purchase of an interest in future receipts and that Itria has taken a real risk that receipts might stop and that Itria might not be repaid.  It also argues that the reconciliation provisions in its contract show that repayments can be adjusted to account for changes in receipts and that this shows that the transaction was not a loan.  However, a number of features of the Itria transaction show that the Debtors have stated plausible claims that the transaction was in reality a loan.

First, although the agreement purports to be a purchase of a share of future receipts, there are two separate Debtors who are party to the Itria agreement.  Itria did not purport to buy separate shares of receipts from them.  The two Debtors also do not appear to possess separate reconciliation rights.  Instead, their obligations appear to be joint and several.  If one Debtor suffered a calamity and ceased to have any future receipts, Itria would continue to collect the full amounts due to it from the other Debtor's receipts until such time as full payment was recovered.  A breach of representations by one Debtor (as to its financial condition, for example) also would constitute a Material Breach and would give Itria full recourse to recover its full claim from both Debtors, even if the other Debtor itself had breached no provision of the contract.  These features are sufficient

38

to support the Debtors' allegations that the transaction is really a mutually-guaranteed loan rather than a true sale of receivables.

Second, it appears that the Debtors were in Material Breach of the Itria agreement from the moment it was executed. The Amended Complaint includes allegations about the Debtors' prior secured loans and the collateral in which those lenders had interests, and about prior merchant cash advance transactions in which the Debtors had engaged. The Itria agreement includes representations by the Debtors that no such other transactions and no such other security interests existed, and misrepresentations about those facts were Material Breaches. Itria had full recourse against the Debtors, and a secured claim, to recover all of the amounts that were payable to it whenever a Material Breach occurred, and so it appears (at least at this stage of the proceedings) that Itria had full recourse against the Debtors during the entire term of this transaction. Even Itria appears to concede, in its reply brief, that this is a fact that would support the conclusion that the transaction was a loan and not a sale. *See* Itria Reply Memorandum (ECF No. 45) at 11 (attempting to distinguish some prior authorities by contending that in those cases "merchants were in automatic default from the execution of the agreements, thereby allowing the funders to immediately enforce the personal guaranties"); *People by James v. Richmond Cap. Grp. LLC*, No. 45138/2020, 80 Misc. 3d 1213(A), at *4 (Sup. Ct. N.Y. Cty. Sept. 15, 2023) (finding MCA agreements to be loans where the funders engineered merchants' immediate default by requiring merchants to make knowingly false representations that receivables were unencumbered the day the MCA agreements were executed).

Third, a plausible case has been stated that Itria took no substantial market risks and that the risks of nonpayment that Itria took are merely credit risks in disguise. The "Receivables" out of which Itria was entitled to payment covered virtually every kind of receipt the Debtors would

39

be expected to have, so that Itria was entitled to a full recovery "in virtually every imaginable circumstance." *Fleetwood (S.D.N.Y.),* 2022 U.S. Dist. LEXIS 100837, at *34-35, 39. The only way that Itria was at any purported "risk" was if somehow the Debtors incurred an unexpected and calamitous loss of business that utterly terminated the Debtors' continued receipts of funds, so that the Debtors effectively ceased to be operating businesses, and if this somehow happened without the Debtors having violated any of the financial representations and business covenants set forth in the Itria agreement, without the Debtors having violated their covenants to provide immediate notice to Itria of changes in the Debtor's financial condition, and without the Debtors having previously breached any of the payment or other provisions in that agreement. Further discovery may reveal if this "risk" has ever materialized. When I asked Itria's counsel, at oral argument, to describe how it might come about, counsel could not do so.

The Debtors have also stated a plausible case that the "risk" posited by Itria – that the Debtors would cease to have any receipts at all – is just the risk that the Debtors' might entirely cease to exist as operating businesses and thereby suffer a corporate death. The risk that a borrower might die, however, is a risk that every lender takes, and the New York courts have made clear that this is not a risk that removes a transaction from the reach of the usury laws. *Colton v. Dunham*, 2 Paige Ch. 267, 273 (1830) ("the risk of loss by the death or insolvency of the borrower is not such a contingency or hazard as will take the case out of the operation of the [usury] statute"); *Vee Bee Serv. Co.*, 51 N.Y.S.2d at 600 (same); 72 N.Y. Jur. 2d Interest and Usury, § 86 (noting that a risk of loss that warrants an exception from usury laws "is to be distinguished from the risk of nonpayment that is inherent in every loan and that may only be compensated for by statutory interest"). As Professors Hilson and Sepinuck have observed:

> In a sale of future receivables, however, the risk that there will be no
> receivables from which to extract payment is not appreciably different from
> the risks associated with the creditworthiness of the client. In other words, if
> a business ceases to generate income, it can neither repay a true loan nor return
> an advance against future receivables. The risk is essentially the same.
> Moreover, it is the risk that interest rates traditionally compensate for, and
> hence a risk that should not exempt the financier from usury laws.

9 The Transactional Lawyer at 3.

Other provisions in the agreement support the contention that Itria was really taking on credit risk, not market risks. The Itria agreement includes representations that the Debtors were solvent, that their financial statements and disclosures were accurate, that no material adverse event had occurred or was expected, that no material judgment had been entered, and that the Debtors were not contemplating bankruptcy. Breaches of these credit-related covenants constituted "Material Breaches" that gave Itria full recourse against the Debtors and the guarantors, even if no diminution in receipts occurred.

<u>Fourth</u>, the Itria transaction does not have the features one would expect to find in a true sale transaction. *Fleetwood (S.D.N.Y.),* 2022 U.S. Dist. LEXIS 100837, at *34-35 (holding that the agreement in that case had none of the characteristics of a sale of receivables in terms of the transfer of risk and rewards); *J.P.R. Mech. Inc.*, 2025 Bankr. LEXIS 1319, at *26 (finding a loan where a transaction lacked the provisions that a true sale would have); *Hilson & Sepinuck*, 9 The Transactional Lawyer at 3 ("the financier remains entitled to payments until it receives the Purchased Amount, so the financier really has few or none of the attributes of ownership of any particular receivable or set of receivables"). Among other things:

- The agreement does not identify any particular receivables that are being purchased. *Haymount*, 609 F. Supp. 3d at 249 (citing the fact that no specific receivables or accounts were identified as a factor that showed that the purported risks of a buyer did

41

not really exist); *Funding Metrics, LLC v. NRO Boston, LLC*, No. 64202/2016, 2019 N.Y. Misc. 4878, at *10 (Sup. Ct. Westchester Cty. Aug. 28, 2019) (finding a loan where, among other things, an MCA agreement purported to buy receivables but did not designate any actual receivables that were dedicated to repayment); *J.P.R. Mech. Inc.,* 2025 Bankr. LEXIS, at *26. Itria therefore did not assume the credit risks of any particular customer, or the risks of nonpayment associated with any particular receivable. *Fleetwood (S.D.N.Y.)*, 2022 U.S. Dist. LEXIS 100837 at *34-35; *Haymount,* 609 F. Supp. 3d at 247 ("If the lender's risk is derivative or secondary and the borrower remains liable and bears the risk of non-payment by the account debtor, while lender only bears the risk that non-payment will leave the debtor unable to pay, there isn't a bona fide purchase of receivables.")

- Itria requested information, representations and covenants about the Debtors' financial condition, but allegedly requested no information and did no investigation as to the financial condition or creditworthiness of any of the parties who would be making payments with respect to Receivables. Amended Complaint ¶ 42, 123-126.

- The Itria agreement also contemplated fixed weekly payments; those payments could potentially be adjusted if the Debtors so requested, but there appears to be no mechanism by which Itria would receive the benefit if collections were received faster than anticipated. Itria therefore did not acquire the upside a that buyer ordinarily would expect. *Fleetwood (S.D.N.Y.),* 2022 U.S. Dist. LEXIS at *34-35.

- If a customer failed to pay, the "buyer" in a true sale transaction would be expected to have the right to collect from the customer. *Id*. at *35; *J.P.R. Mech. Inc.*, 2025 Bankr.

LEXIS, at *26.  That was not the case here.  Itria had no rights against customers unless some other Material Breach occurred.

Fifth, the Debtors have plausibly alleged that the reconciliation provisions in the Itria agreement were illusory and that Itria did not actually have staff to perform reconciliations. Amended Complaint ¶¶ 41-42.  That allegation is sufficient to support a claim that the transaction is really a disguised loan.  *See, e.g., Davis v. Richmond Capital Grp., LLC*, 194 A.D.3d 516, 517 (1st Dep't. 2021); *see also Haymount*, 609 F. Supp. 3d at 248-9; *Lateral Recovery LLC,* 2022 U.S. Dist. LEXIS 129032, at *15 (finding a loan where, among other things, the lender's obligation to reconcile was dependent on documentation to lender's satisfaction and lender could therefore nullify the obligation).  Itria can and does dispute the Debtors' allegation, but that is just a factual issue for trial, not an issue to be resolved on a motion to dismiss.

Sixth, the Debtors have plausibly alleged that the agreement provides Itria with many ways to collect on its debt even if the debtor stops generating receivables.  *Haymount*, 609 F. Supp. 3d at 249; *LG Funding, LLC,* 181 A.D.3d at 666. The Itria agreement includes representations that the Debtors were solvent, that they had made accurate disclosures of their normal revenue streams, that no material adverse event had occurred or was expected, that no material judgment had been entered against them, and that the Debtors were not contemplating bankruptcy, as well as covenants that the Debtors would continue to operate their businesses and would continue in good faith to generate receivables.  Any breach of those representations and covenants was a Material Breach that gave Itria full recourse against the Debtors and the guarantors.  Bankruptcy itself is not a listed default, but almost any bankruptcy would "interfere" with Itria's collection rights or require changes to the accounts that the Debtors use, and these would separately constitute defaults under the Itria contact.  *See J.P.R. Mech. Inc.,* 2025 Bankr. LEXIS 1319, at *23-24 (noting that

almost any bankruptcy would necessarily interfere with the defendant's right to collect and therefore would cause a default giving full recourse against the debtor).  There are also many other circumstances that constitute Material Breaches under the Itria agreement and that entitle Itria to full recourse against the Debtors (including in bankruptcy), regardless of whether the Debtors are continuing to have receipts.  *Akf Inc. v. Haven Transp. Bus. Sols. Inc.*, No. 22-cv-269 (MAD/CFH), 2024 U.S. Dist. LEXIS 103271, at *18-19 (N.D.N.Y. June 11, 2024) ("Despite the[] assertions in the Agreement of being left without recourse in the event of a bankruptcy, it seems virtually certain that FundKite would be able to file a claim in any bankruptcy proceeding, as a secured creditor, for any remainder of the [amount] owed.")

Similarly, the guarantors' obligations are not limited to situations in which the Debtors have actually received funds and have failed to pay them to Itria, or have otherwise interfered with Itria's collections.  They instead apply whenever any Material Breach occurs, including an alleged misrepresentation about the Debtors' financial condition or a failure to provide Itria with immediate updates as to the same.  *See Fleetwood (2d Cir.),* 2023 U.S. App. LEXIS 14241, at *4 (guarantees are suggestive of a loan when they are not limited by the purportedly contingent nature of the merchant's obligation).  The many provisions in the agreement regarding representations about the Debtors' finances, the nature of the events that constituted Material Breaches, the acceleration provisions, the personal guarantees, and the secured claims granted in favor of Itria are terms more commonly found in lending agreements than in true sales of receivables.  K. Bruce, Revenue-Based Finance in Bankruptcy and Beyond, 45 Bankruptcy Law Letter 1, 3 (April 2025).

Seventh, there are features of the reconciliation provisions in the Itria agreement that undercut Itria's contentions about the "robust" protections that these provisions allegedly provide. In Itria's view, the reconciliation provisions provide assurances that actual payments will not

exceed the proper percentage of the Debtors' actual recoveries.  However, Section 5 of the Itria agreement also limits a reconciliation request based on past receipts to a period that does not exceed a calendar quarter.  No explanation has been provided as to the reason for this time limit. The agreement also gives Itria the right (if a reconciliation request is properly documented) to give the Debtors a "credit" instead of a refund.  A credit just reduces future payments and does nothing to address any potential excess in payments that might have already occurred.  Each of these features is designed to assure that Itria can keep some or all of the payments that have already been made to it, even if the records show that the payments were excessive, which plausibly supports the contention that the transaction was not really a "sale" of an interest in receivables.

The provisions of Itria agreement regarding a "forward adjustment" in payments also do not include any specifics as to how such a forward adjustment might be calculated.  Assume, for example, that a debtor had a sudden and drastic reduction in receipts.  If a forward adjustment were to be based on the debtor's average collections over a past period (a calendar quarter, for example), then there would be an automatic time delay before the reduction in periodic payments would match the actual current reduction in collections.  Further evidence will be required as to how this feature of Itria's reconciliations actually worked and whether, realistically, it was designed in a manner that is consistent with the manner in which a "sale" ordinarily would work.

Eighth, Itria's arguments that its agreement does not have a "fixed duration" does not carry the weight that Itria contends.  The agreement provides for fixed monthly payments, so that the expected duration of the agreement can easily be calculated.  *Lateral Recovery LLC,* 2022 U.S. Dist. LEXIS 129032, at *16; *J.P.R. Mech. Inc.,* 2025 Bankr. LEXIS 1319, at *22 (same).  The expected repayment term might change in the event of a reconciliation, and that is certainly a factor

to be considered.  However, I cannot accept Itria's contention that such a potential change in the repayment period  somehow means that the transaction was not a loan as a matter of law.

The existence of a fixed repayment term is a factor that suggests that a "sale" is really a loan, but that does not mean that the opposite is always true.  There are many loans that do not have fixed terms, the most common of which is a "demand" loan that is repayable only when demand is made and not on a fixed schedule.  There are also loan transactions that include provisions under which reductions in the borrower's income may result in a suspension of payments and a postponement of maturity dates – the most common ones that come to mind are student loans, which may have such features included in the loan terms themselves.  Student loans may also include provisions under which payments (including interest accruals) are deferred if the borrower goes back to school, or enters a graduate fellowship program, or is employed in public service, or is in military service.  These are, essentially, advance agreements to forbear from the collection of a debt under certain circumstances.  So far as I am aware, nobody believes (or reasonably could argue) that these advance forbearance provisions mean that the student loans are no longer loans.  The New York usury laws apply not only to agreements to lend money but also to "forbearance" agreements, so it would be highly peculiar if the presence of a provision in an agreement that calls in advance for forbearance under certain conditions would itself be deemed to be a factor that negates the application of the usury laws.

*        *        *

The foregoing points should not be interpreted as rulings on the merits of the parties' respective claims.  They are only intended to identify grounds on which the Debtors have stated valid claims at the pleading stage.  A true assessment of the character of the parties' transactions will await a trial on the merits.

### D. **Itria's Waiver Argument.**

Itria argues that the Debtors have waived any contention that the transactions were loans and not sales. New York courts have been curiously inconsistent in how they have treated such waivers.

Some New York courts appear to have treated such contractual waivers as enforceable, citing general case law regarding parties' rights to waive counterclaims or affirmative defenses and treating waivers of usury defenses as matters that are no different from waivers of such other defenses. *See, e.g., Avanza Cap. Holdings, LLC v. Arm Consulting Corp.*, No. 511195/2025, 2025 N.Y. Misc. LEXIS 10121, at *2 (Kings Cty. Dec. 10, 2025) (holding that a waiver in a merchant cash advance agreement is enforceable and relying on general case law regarding the contractual waiver of offsets, defenses and counterclaims); *Feldman v. Torres*, 939 N.Y.S.2d 221, 224 (N.Y. App. Term 2011) (providing that contracting parties may waive defenses, including usury); *RMP Capital, Corp. v. Victor Jet LLC*, No. 12-6197, 2013 WL 1822727, at *5 (N.Y. Sup. Ct. Suffolk Cty. 2013) (trial order) (enforcing a contractual waiver of a usury defense and other defenses). Itria urges me to adopt that same approach here, citing a number of cases that deal generally with the waiver of potential defenses, particularly when such waivers have been made by guarantors.

Other New York courts, however, have adopted a different rule where an arguably usurious contract includes a waiver of usury defenses. Many courts have held that a usurious agreement is void and that any waivers contained therein (including waivers of usury defenses) are also void, while others have held more generally that the enforcement of a waiver of a criminal usury defense is against public policy. *See Hammelburger v. Foursome Inn Corp.,* 76 A.D.2d 646, 650 (2d Dep't. 1980) ("it would seem to follow that a party cannot waive his right to be protected from criminally usurious loans"); *Singh v. LCF Group, Inc.*, No. 601297-23, 2023 N.Y. Misc. LEXIS 5285, at *17-

18 (Nassau Cty. July 25, 2023) (Usurious contracts are void and "Plaintiffs' ability to raise usury in defense to confessed judgments is well-established and cannot be waived"); *Reserve Funding Grp. LLC v. Cal. Organic Fertilizers, Inc.,* No. 24-CV-1112 (ARR), 2024 U.S. Dist. LEXIS 67438, at *5 (E.D.N.Y. Apr. 12, 2024) (holding that usury is an affirmative defense but further noting that usurious agreements may not be enforced and that "[c]riminal usury cannot be waived by contract"); *Hi Bar Cap., LLC v. Excell Auto Grp., Inc. Karma of Palm Beach, Inc.,* No. 502846/2022, 2023 N.Y. Misc. LEXIS 68877, at *5-6 (Kings Cty. Jan. 12, 2023) (holding that "the defense of criminal usury cannot be waived as such would violate public policy"); *Haymount*, 635 F. Supp.3d at 242 (finding class action waivers to be void if the underlying contract was void on usury grounds); *Nicole Bolt Comer v. Advanced Capital, Inc.,* No. 719947/19, 2020 N.Y. Misc. LEXIS 9101, at *5 (Queens Cty. May 27, 2020) (waiver of usury contentions in a loan agreement is contrary to public policy); *Lateral Recovery LLC v. Funderz.net, LLC*, No. 22-cv-2170 (LJL), 2024 U.S. Dist. LEXIS 176985, at *10 n. 8 (S.D.N.Y. Sept. 27, 2024) (refusing to enforce a "savings clause provision" that included a waiver of usury defenses).  This result is consistent with the principle that where the agreement is itself rendered illegal and void (on usury or other grounds), courts will not sever and enforce incidental legal clauses, including purported waivers. *Moss v. First Premier Bank*, No. 2:13-cv-05438 (ERK), 2020 U.S. Dist. LEXIS 160253, at *9-10 (E.D.N.Y. Sept. 2, 2020) (holding that a class action waiver in a usurious contract was not enforceable); *Manufacturers Hanover Trust Company/Capital Region v. Meadowdale Dev. Co.*, 91 A.D.2d 1087, 1088 (3d Dep't. 1983) (refusing to enforce a waiver of usury defenses in a loan modification and extension agreement).

New York cases have held that a borrower may be estopped from asserting usury defenses if the borrower induces an innocent third party to acquire the lender's position based on the

borrower's assurances that usury defenses do not exist.  *See Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 592 (1981).  However, there is no allegation that anything of that kind has happened in this case.  New York cases have also held that parties may waive usury defenses in subsequent settlement agreements, but even in that circumstance the New York courts have invalidated such waivers if "the original usurious obligation transcends into the parties' subsequent agreement."  *Adar Bays, LC v. 5Barz Int'l, Inc.*, 2018 U.S. Dist. LEXIS 139843, at *16 (S.D.N.Y. Aug. 16, 2018); *Aquila v. Rubio*, No. 33561-12, 2016 N.Y. Misc. LEXIS 1581, at * 21 (Suffolk Cty. May 2, 2016).

I note that some New York court decisions have cited to the waiver provisions in merchant cash advance agreements while then going on to consider whether the transactions were truly "loans" or "sales," thereby treating the waiver language as irrelevant or unenforceable, though without discussing the issue further.  *See, e.g., Barrier Grp. Inc. v. BMF Advance LLC*, No. EF004150-2022, 2023 N.Y. Misc. LEXIS 1032, at *19 (Orange Cty. Mar. 15, 2023).  We have attempted to determine how courts have treated waiver issues in the more New York recent cases involving merchant cash advance transactions, and it appears that the defendants have not even asserted waiver arguments in most of those cases, though waiver provisions are normally (if not always) included in the underlying contracts.  Itria has urged me to dismiss the Debtors' usury claims on waiver grounds, but the other Defendants have not done so, even though their contracts include similar waiver provisions.

Usurious agreements are void in their entirety, so it would be very odd to say that a usury violation could be cleansed just by adding waiver language to the originally usurious agreement itself.  The prevailing rule in New York, as described above, is that such waivers are not enforceable.  This also appears to be the prevailing rule in other jurisdictions.  *See* 44B Am Jur2d

Interest and Usury § 183 ("The decisions seem universally in accord that a borrower cannot, during the existence of the debt, and while the relation of debtor and creditor continues, by executory agreement of any kind or nature, relinquish claims or defenses based upon an exaction of usury, but they also agree that in executed agreements of settlement, concluding the relations of the parties, based upon valid and adequate consideration, honest differences, and good faith, such claims and defenses, involved in past transactions, may be released.")

The purported waivers in the transaction documents therefore would not have barred the Debtors, at an earlier time, from asserting usury defenses to their payment obligations or to Itria's request for entry of a judgment.  As a matter of New York state law, the Debtors' failure to raise the affirmative defense of usury in the New York State court filed by Itria would be binding on the Debtors and would constitute a waiver of the usury defense as a matter of New York state law. *Prof'l. Merch. Advance Capital, LLC v. C Care Servs., LLC*, 2015 U.S. Dist. LEXIS 92035, at *5 (S.D.N.Y. July 15, 2015); *Higgins v. Erickson (In re Higgins)*, 270 B.R. 147, 156 (Bankr. S.D.N.Y. 2001).  As noted above, however, the Debtors have stated plausible claims that the Debtors' failures to raise defenses at an earlier time amounted to fraudulent transfers, so that the prior waivers should be undone and the transactions of which they were a part should be nullified, and the Debtors (as debtors in possession) are entitled to pursue those fraudulent transfer claims.

### F.    <u>Itria's Argument About Its Alleged Intent.</u>

Itria contends that the Amended Complaint does not fairly allege that Itria "knowingly" charged usurious interest, but in fact the Amended Complaint explicitly alleges that Itria and the other Defendants purposely disguised their loan transactions for the purpose of evading usury laws. *See* Amended Complaint ¶ 24.  To the extent that any allegation of intent is required, it is included in the Amended Complaint.

IV.    **The Debtors' Contentions that the Defendants Seek "Unmatured Interest."**

Section 502(b)(2) of the Bankruptcy Code provides that claims to recover unmatured interest should be disallowed.  11 U.S.C. § 502(b)(2).  There is an exception for secured claims, but only to the extent that the value of the claimant's security interest is sufficient to cover a post-petition interest accrual.  11 U.S.C. § 506.  The Debtors allege that other creditors have senior interests in the Debtors' assets and that the Defendants' claims should be treated as unsecured claims.  However, the Amended Complaint does not sufficiently allege that any "unmatured" interest is owed.  Instead, it describes the expected payment terms for each agreement and makes clear that all of the payments due to the Defendants would have come due prior to the date of the bankruptcy filings.  In that case, the amounts that the Debtors wish to characterize as "interest" payments would already have accrued.  The interest might be unpaid, but it would not be "unmatured."  I will dismiss this claim in the Amended Complaint, without prejudice to repleading if the Debtors believe that a repleading is possible.

V.    **The Equitable Subordination Claims.**

The Debtors have asserted a host of wide-ranging allegations about unconscionability, fraudulent inducement, impossibility and other theories, only to allege at oral argument that they are relevant only to the claims of equitable subordination.  Frankly, it is too difficult at this stage to parse just what specific allegations are the bases for the equitable subordination arguments and which ones suffice or do not suffice.  I will dismiss the equitable subordination claims due to the lack of clear pleading, without prejudice to the Debtors' rights to restate their theories of equitable subordination in an amended pleading and without prejudice to the Defendants' rights to challenge the sufficiency of the same.

## <u>Conclusion</u>

For the foregoing reasons, the Defendants' motions to dismiss the claims in the Amended

Complaint are to be granted in part and denied in part.  More particularly:

- The motions to dismiss are DENIED with respect to Plaintiffs' contentions that the entire transactions with the Defendants were fraudulent transfers;

- The motions to dismiss are DENIED with respect to Plaintiffs' contentions that their failures to assert usury defenses at the time individual payments came due were waivers of valuable rights that inured to the benefit of the Defendants and that enabled the Defendants to receive payments to which they would not have been entitled if the defenses had been asserted, and that the waivers and payments should be avoided on fraudulent transfer grounds;

- Itria's motion to dismiss is DENIED with respect to Plaintiffs' contention that their failure to assert usury defenses at the time Itria sought the entry of judgment were waivers of valuable rights that inured to the benefit of Itria and that should be avoided on fraudulent transfer grounds;

- The motions to dismiss are DENIED as to Plaintiffs' claims under Section 502(d) of the Bankruptcy Code;

- The motions to dismiss are GRANTED to the extent that Plaintiffs have asserted rights and defenses under New York's civil usury laws;

- The motions to dismiss are GRANTED to the extent that Plaintiffs have sought to recover prior payments based on criminal usury theories standing alone (though as stated above Plaintiffs may argue that their prior failures to assert usury defenses should

be undone on fraudulent transfer grounds and may seek to recover prior payments pursuant to those fraudulent transfer claims);

- The motions to dismiss are DENIED as to Plaintiffs' claims that the remaining obligations owed to the Defendants are barred by New York's criminal usury laws;

- The motions to dismiss are GRANTED as to Plaintiffs' claims of unconscionability, fraudulent inducement, impossibility and as contracts of adhesion;

- The motions to dismiss are GRANTED as to Plaintiffs' contentions that the Defendants seek the payment of "unmatured interest," without prejudice to Plaintiffs' right to replead that claim; and

- The motions to dismiss are GRANTED as to Plaintiffs' claims of equitable subordination, without prejudice to Plaintiffs' rights to clarify and to replead their allegations.

A further amended complaint should be filed to conform to these rulings. The amended pleading should clearly separate the remaining causes of action and separately plead the elements of each such claim and should also eliminate the duplication in the asserted claims, so that the parties and the Court will have a clear roadmap as to the issues that must be addressed and the relief that is being sought under each theory. The parties are directed to confer and to prepare an order that gives effect to these rulings and that establishes a deadline for the filing of a further amended complaint.

Dated: New York, New York
February 20, 2026

**s/Michael E. Wiles**
HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE